May it please the Court. I'm Rebecca Knoblan. I represent Appellants Oceana and Greenpeace, and I will endeavor to reserve five minutes for a rebuttal this morning. There are two simple legal questions I'd like to probe this morning. The first is, did the National Marine Fisheries Service meet its duty to ensure that large-scale industrial fisheries don't jeopardize endangered stellar sea lines? And the second is, did the Service meet its duty to explain why it was rolling back protections? The answer to both of these questions is no, and to explain why, I'd like to make three points. The first is that in 2014, the Service disregarded its own experts and set an unexplained and unlawfully high bar to get to jeopardy. The second... Counsel, let me just ask you this. Sure. Under our case law, does what happens internally in an agency count for purposes of determining what's appropriate and analyzing... the outside is clear, but inside, what case law would you refer us to? And are you referring to the National Environmental Policy Act plans? Yeah, exactly. The case law doesn't distinguish between internal and external experts. I thought it referred to the outside input. In other words, they've got to consider what outside, if you will, petitioners, complainants have to say. They have to deal with their... But is there a case law that says that with respect to an internal staff member or an internal expert, the same burden applies? Yeah, so the regulation that's at issue is 40 CFR 1502.9, and that regulation doesn't distinguish between internal and external. It says the agency shall discuss at appropriate points any responsible opposing view. The cases that have looked at this in Western Watersheds Project v. Cryenbrink, the court looked at both internal and external expert opinions and struck down the EIS because the agency in that case hadn't responded to those opinions. It included the internal expert's opinions in that. In both Wild West Institute and Greater Yellowstone Coalition, the court looked at internal expert opinions to determine whether the service had met its duty under 40 CFR 1502.9. In both those cases, it determined that the agency had properly addressed the internal opinions, but it didn't make any distinction between internal and external experts. Let me ask you about the regulation itself. It says it starts by saying that final environmental impacts shall respond to comments as required in Part 1503. What is Part 1503 about? Is that about public comments? That's right, yeah. So the context of this seems to me to be responding to comments from outside the agency, because otherwise every time you have, you know, 15 people giving input into a final decision internally, it would just expand exponentially the way that an EIS is drafted, and it's pretty big already. So I'm not sure how what you're suggesting is consistent with the regulation. The purpose of the regulation, and I think the reason it doesn't distinguish between internal and external experts, goes to the purpose of NEPA, which is to properly inform the public of the environmental impacts of the action and to inform the agency. And so there's no reason that the internal experts' opinions shouldn't be made public in the same way that the external expert opinions were. Here we have... Aside from your own construction of the regulation in Lance Counsel v. McNair,  acknowledge and respond to comments by outside parties that raise significant scientific uncertainties and reasonably support that such uncertainties exist. So there's case law. I know about that one. It was a unanimous, en banc decision. What authority would you cite to us that says we have to look at inside-the-park disagreements? Right. To my knowledge, and you know that case better than I do, but I don't think it was a question in that case whether they would respond to internal expert opinions. In that case, they were just looking at external ones. Western Watersheds Project v. Cryinbrink, again, looked at both internal and external expert opinions and struck down the EIS based on the agency's failure to address both of those opinions. I had another question, though. Assuming that you're correct about that, I'm not really sure what the agency didn't do that you think it should have done because compared to the 2010 buyout, 2014 took account of these criticisms and said the data are really limited and acknowledged that and said we're just doing the best we can with not a very small number of samples. So what else, besides acknowledging the problem that was raised, should they have done? Again, if we're talking about the EIS here, the agency had a duty to disclose controversy regarding this decision. What the agency did in the 2014 EIS is it disclosed the controversy that supported rolling back protections, that is, the controversy that surrounded the 2010 biological opinion. What it didn't do is address its own experts' criticism of this overlap analysis. Well, there were some people, I guess, who thought that there was insufficient data to make any decision, and that they didn't agree with. But they did acknowledge, I mean, they changed it to acknowledge this problem, and I guess I'm not sure why that isn't sufficient under the statutory standard. They changed the EIS to acknowledge the problem? Well, they changed the, the opinion was different in 2014. Yeah, and if I could, I'd like to move to the talking about the biological opinion itself. The biological opinion started from the same premise as prior biological opinions, and that's that fisheries may be contributing to sea lion decline. And from there, the biological opinion went on to determine whether the fisheries measures at issue here jeopardized sea lions. And that's where it did its overlap analysis. And while that overlap analysis relied on the same factors as prior biological opinions, it applied a new test to those factors that made it harder to get to jeopardy. Now, the service has been looking for many years at the extent to which fisheries and sea lions are operating in the same times and places and going after the same fish. What it did differently in 2014 is it said, even if we have overlap in three dimensions, if there's low overlap or what the service calls partitioning in just one dimension, that means that there's not competition. I don't read it that way. But, and if it, I just don't agree with your reading of what they did in the, in the 2014 opinion. And if the overlap analysis is essentially the same in terms of looking at those four factors, I guess they're not really factors, but those four ways of looking at things, then what's, then what, what flows from that? If the overlap analysis, if they didn't change the overlap analysis. If the overlap analysis is proper, does everything else fall or do you still win? And if so, why? The overlap, so of course we disagree with that premise that the overlap analysis is the same. But even if the, if the service looked at the same, you know, dimensions and applied the same test in 2014, the service still relied on data that its own internal scientist said it couldn't rely on. The internal scientist said, we simply don't have enough information to conclude that if there aren't sea lions here, that means that they're not competing with the fisheries, or if we don't have data of the sea lions being there. Does your case depend on the comments of the internal scientists? Certainly the internal scientist comments are a good way to understand what the service was doing. It's a, it's a better explanation of what the overlap analysis is doing. I guess my question is, if, if, if we believe that our case law does not require certainly that the internal comments be considered, what impact does that have on your case? The service has a duty to ensure against jeopardy and it has a duty to explain how it's coming to its decision. Right. The biological opinion doesn't offer any factors on which it would come to its no jeopardy conclusion without its faulty overlap analysis. With respect, counsel, I, my understanding is that all of the agencies, and indeed you folks, use modeling. Most of this is a mathematical calculation because the reality is you can't go out and determine what's exactly happening. Right, absolutely. You can just model it. That's all you're doing. Everybody does it in good faith, but that's what you're doing. Right. In this case, as my colleague has suggested, there's a massive record, massive record, all kinds of data, all kinds of information and modeling, and at least as I read it, they are, the actual text of what they said doesn't do violence to Section 7 of the ESA. They're simply saying, okay, if you apply the model, this is how we view it. We think it's a little different than before, but we don't think that the species is jeopardized. Now, I realize you don't agree with that, but I guess my question is, since we are relying on modeling in any event, it's not an exact science, if you will, don't we have to defer to some degree, as I suggested in Lance Counselor versus McNair, to the expertise of the agencies unless there is a clear disconnect between proven science and what was done there? Here the agency didn't, it changed the way it looked at overlap, and we see that. And can you be a little more specific? I know you put it in the brief, but if you had to pinpoint it, in what way did it change the way that it looked at the data? So the. I know it didn't follow that diagram from the 2010, but in what way did it actually change its analysis? Sure. In prior overlap analyses, if there was some amount of overlap between the fisheries and the sea lions, it assumed that that meant there was competition. What it did differently in 2014 was it said that there had to be overlap in all four dimensions to assume there's competition. And we see in the Jeopardy assessment, for example, for pollock, the survey says, the potential for competition between the pollock, fishery, and sea lions may be reduced or eliminated because they're at different depths. That's at 3ER414. We have these conceptual models which you refer to that show that you need overlap in time, depth, space, and size of fish. And we have the internal agency scientists saying, hey, here you're applying an implicit assumption that one dimension of partitioning is all that's necessary to conclude there's no resource competition. And they were worried that the services analysis hinged on this. Given the record, the service changed the way it was looking at overlap. It applied a new bar, and it didn't give sea lions the benefit of the doubt in changing. Your view is that, and I'm not saying I agree with you, but if they changed their analysis, came up with a different model, you're saying they can't do that? Once they adopt a model, they cannot change it in looking at the same data? No, that's not our view. Our view is that here the agency hasn't explained why it's changing the model to one that is less precautionary. In fact, the agency has denied that that's what it's done. Well, I guess it goes back to my reading it completely differently because there are some areas, and I don't have the page numbers in front of me, but it seems to me there were some areas in which they found a problem with resources for the sea lions even though they had found some partitioning. So it seems to kind of run, the content of it seems to run counter to your argument about the sort of if there has to be four, you know, all four have to be met. I just don't see that in the content. So I'm still uncertain as to how you think that you can succeed if we disagree with you about the overlap analysis. I think that, again, you know, we have separate claims in our brief. One is about the change in the overlap analysis. One is about regardless of whether it's changed or not, the service relied on science that its own scientists said couldn't be used for that purpose and that the service itself didn't disagree with the service, didn't say, no, we can use the science for this purpose, but it continued to rely on overlap in its no jeopardy conclusion. Now, the service does say that there are other factors that it relied on in its no jeopardy conclusion, but the service can't point to anywhere in the biological opinion where it says that these other factors independently can uphold its no jeopardy decision without this overlap analysis. And so if there are problems with the overlap analysis, that goes to the it's not harmless error and it's fatal to the no jeopardy conclusion itself. Did you wish to save some rebuttal time? Yes. You may do that. Thank you. Thanks. Good morning. I'm David Gunter from the Department of Justice here on behalf of the Fisheries Service. The endangered portion of the stellar sea lion as a species is not declining. It has virtually no extinction risk in the next hundred years. So what we're really interested in in this case is the service's analysis of how the fisheries might compete with this particular sub-regional population in the western Aleutian Islands. And what the service found is that the fisheries would not compete with that population sufficiently to cause jeopardy to the survival or recovery of the western DPS as a whole. In reviewing that decision, the United States is asking the court only to apply the same rule that it applied in reviewing the 2010 biological opinion in Alaska v. Lipchenko in 2013. And that is to uphold the service's ability to review and make decisions based on the best available scientific information. Can I ask you, as you're talking about best available scientific information, if you may recall we had a discussion with your opposing counsel about which scientists the agency has to consult. Obviously you have internal scientists. She's suggesting that the regulations require that the agency address, probably specifically, what internal scientists say. It's a little bit like saying that if you have the executive or a law firm and a bunch of people talk about things, you've got to include anything that's said, even though it may just be a consideration. What's your view of the law? Does the agency have to consider and comment on what its own internal experts say? The agency has to disclose responsible opposing scientific viewpoints, but those can be put into the record by plaintiffs when they're commenting on the EIS as a whole. And as you pointed out earlier in Land's counsel, the court en banc said that scientific questions like this are complicated, scientists disagree. It would be too burdensome to require the agency to put all of its deliberative process that it goes through in reaching these decisions into the record itself. I want to be sure I get your answer. So you're saying that you do consider the internal scientific comments? We have to consider them to the extent that we are required to take a hard look at all of the relevant issues. Do they have to be documented in the report to the public? That's what I was going to get to next. That does not mean that all of the internal disagreement that may occur within an agency has to be put in the final environmental impact statement itself. Now, counsel cited Western Watersheds, and that's an extreme case in which not only internal disagreement, but also comments from other federal and state agencies, what the court described as a deluge of negative comments, just went unanswered by the agency. This is a different case in which a few commenters on the draft biop, in things like memos that admitted they hadn't read the entire draft biop, in things like comment bubbles in a Word document, were sharing their views with each other, and I think the record reflects that in the final biop, the agency took account of those concerns and made sure that the final biop didn't go too far in terms of how much weight to give to the scientific evidence. As a legal proposition, looking at the regulation section 1502.9, it does require a response to responsible opposing views, and I guess the legal question in part is whether responsible opposing views in the context of that regulation refers to internal agency people as well as members of the public or other agencies. I think it refers, well, other agencies is a separate and interesting question. Okay, I'll leave that out. That is not presented here. Okay. Because there are some, some negotiations. Yeah, let me leave that. In terms of, in terms of internal to this agency, I think the regulation that you cited is mostly about how the agency responds to outside comments, and I think if the court looks at. Well, mostly is kind of a fudge because, I mean, they either do or don't have to discuss at appropriate points in the final statement responsible opposing views. They either have to do it or they don't, you know, leaving aside what's responsible and opposing and all of those other issues. But does that include internal as well as external? Sure. The reason that I fudge a little bit is because of the NRDC, the Pritzker case, the Toad Sonar recent opinion in which there was actual new work product by a work group of scientists within the agency that this court held the agency was required to disclose and respond to. And that's sort of similar to the Western Watersheds situation in which you have lots of comments by external agencies, internal new work product. But here there's no question of any new work product that the service failed to take into account. It's conceded that we use the best available scientific information in that Oceana doesn't cite a single study or anything like that that reaches a contrary viewpoint that we failed to take into account. I think if you look at the biop, it is exhaustive in reviewing the scientific information before coming to a conclusion. And the only disagreement within the agency was how much weight should we give to particular studies? How definitive should we consider their conclusions to be? And in the final biop, the agency said, it's true that there are significant gaps in this data. We can't infer that there are no sea lions just because some of the sampling data we have doesn't indicate sea lions were there. Maybe the sampling data is incomplete. But that doesn't prevent the agency from reaching the best decision it can based on the best available scientific information. What is your response to the argument that the overlap analysis in 2014 required that all four tests be met before they would be considered a problem? I think that's just not an accurate characterization of how the service changed its analysis. In both of the biological opinions, the service was looking at overlap and partitioning. And in both of the biological opinions, it went on then to consider the response of the species population dynamic to that amount of overlap. But neither one of them mechanistically applied any particular number of dimensions of overlap to find jeopardy or no jeopardy. Instead, they went on to look at what the species response is. I think that what council is really concerned about is this benefit of the doubt principle. Did we resolve uncertainties unfairly against the species in 2014 when we resolved them in favor of the species in 2010 on things like the amount of overlap? And it's true that really their entire argument is that if the fisheries could have an effect on the species, then we were required to assume that they do have an effect on the species. For example, if we find one dimension of overlap, we were required to find that the fisheries would affect the species. Can I ask you this, counsel? I don't mean to put words in the mouth of your opponent, but it seems to me they're suggesting, in effect, that the burden of proof shifts here. That the agency, if there's any difference between the 2010 biop and the 2014 biop, the agency has the burden of proof to show why in each instance it changed its analysis of some of it, the same data. As opposed to, in effect, an hour principle or deference to the agency's scientific determinations per lands council. What's your take on that? I think that is their theory, and I think it's central to their theory. They can't win without it, and so let me explain why it's wrong with respect to the law and then with respect to the record here. This court's case law makes clear that the AESA accepts decision making in the face of uncertainty. The agency does not have to resolve all uncertainty before it can reach a jeopardy decision. And that is the law in Arizona Cattle Growers, League of Wilderness Defenders v. Connaughton, and even in Greenpeace Action, the 1992 case that considered competition between fisheries and stellar sea lions. So the benefit of the doubt principle does exist. It's sort of a burden shifting in that the agency has to make an affirmative finding before it can allow an action to go forward. The agency can't simply say, we don't know enough, and so we're going to allow the action to go forward. But that's different from this situation, in which the agency can make a finding, and there's just some dispute over whether that finding is correct or not. In that situation, the ordinary principles of administrative law in lands council, in San Luis and Delta Mendota, applied to the ESA, provide that the court must defer to the agency's weighing of the scientific evidence. And I think the size of this record is an excellent example of an instance in which the experts at the agency have a better ability than generalist lawyers or generalist judges to decide what the science says. The agency has to make the best assessment it can. It has to acknowledge areas of uncertainty, dissenting views, and then it has to draw a conclusion that the science rationally supports. So this is not a case where the evidence pointed to harm, and the service is saying, well, that evidence is uncertain, and so we will ignore it. This is a case where the evidence generally points in favor of no jeopardy. Almost all of the evidence is, according to the service, against or non-supportive of a theory of nutritional stress. And it's the plaintiffs who are coming in and trying to say, if there's any uncertainty in that, it invalidates the agency's decision. So this goes to the principle of lands council and of many others, which is you've got scientific evidence. Your opponents are very intelligent, capable people, and they're very dedicated, and they look at scientific information. The agencies have similar people. They look at it. There's a disagreement on how to interpret that. Lands council says, among other things, we defer to the agency unless it has failed to consider a significant scientific controversy that has not addressed it or does something that Congress says you can't do. Isn't that right? That's right, and it's not just lands council. Case after case hold that, and cases have applied that even to the ESA, which has this benefit of the doubt principle. So let me take a look at what was different then between 2010 and 2014 that allowed the agency to reach a different conclusion in 2014 than it had reached in 2010 and explain why that's not just a product of failing to give the species the benefit of the doubt. For one thing, there was a different action under review. The fisheries measures that were reviewed in the 2010 biop were not the same as the ones that were reviewed in the 2014 biop. The service also had more information about what the fisheries were likely to do, where they would spend their efforts, so to speak, in terms of seeking fishing. New scientific information was available, especially in the form of new sea lion survey data and new telemetry information, which were relevant to this overlap and partitioning analysis. And most importantly, well, I don't want to say most importantly, but very important in the service's analysis were these criticisms by outside experts, Bernard and Bowen of the 2010 biological opinion, which said that by positing this nutritional stress hypothesis and then concluding that it meant jeopardy without any established scientific connection, the service had made conclusions based on speculation, not on the effects that the evidence demonstrates. Bernard said that whatever may have happened prior to 20 years ago, in the last 10 to 20 years, 100% of tests resulted in outcomes consistent with the ground fish fisheries, having no effect on sea lion numbers in the last 10 to 20 years. And the service didn't just take that for granted. In the study by Kahn and colleagues at the Alaska Fisheries Science Center, which is a component of NOAA, they went and looked at those conclusions that the outside experts had written about and examined whether they could actually determine the effect of different variables on sea lion population dynamics. And they found that one of the key things that the agency had relied on in 2010, notality rates, was a very poor predictor of sea lion population dynamics. In effect, in 2010, the service was asking, could nutritional stress have been causing the decline in the species? And in 2014, it looked for specific evidence that nutritional stress was causing a decline in the species and found none. The new evidence, it said, did not support the conclusion that fisheries are likely to cause jeopardy. Now that doesn't mean that there's no uncertainty. The biological opinion acknowledges that nutritional stress may still be occurring. Future evidence may establish it. There's a reinitiation trigger in the biological opinion that says that if new evidence comes to light that the service has not previously considered but that would affect its analysis here, the service will do this analysis again and decide whether the new evidence leads it to change its conclusion. But acknowledging that uncertainty in the record doesn't show that the agency has failed to uphold its ESA obligations. It shows that the agency is taking the process seriously. But what the ESA doesn't require is to make the agency prove a negative, to demonstrate that conclusively fisheries will have no effect on the species as a whole. I see that my time is almost up and I want to leave time for Ms. Larson, so my closing point will be this. The difference in the agency's decision between 2010 and 2014 should not be a weakness of the government's case here.  The reason is that that change was not driven by a difference in policy or personnel. This was the district court ordering us in 2010 to do an EIS, which we had not done for the interim final rule, ordering us to go back and look at all of this science again. We did that. We went back, looked at it all again, and explained exhaustively why we made the decision that we made. It was purely a response to changing science and our changing interpretation of that science. That's exactly the kind of decision making that the ESA and NEPA are intended to promote. And the district court was right to find that it complied with those statutes here. It should be affirmed. Thank you, counsel. Ms. Larson, you have a little bit of time here. Good morning. Linda Larson for Intervenors. I'd like to talk a little bit about the specifics of the Atka mackerel and pollock fisheries and why NIMS articulated a rational basis for its changes to the management of those fisheries. The Atka mackerel fishery is subject, under the 2014 rule, to new catch limits by area and season that disperse fishing effort in time and space. Vessels are also severely restricted in the locations where they can fish. 90% of critical habitat remains closed to fishing. This is only 8% more open area than was true under the 2010 rules. The fishery is also limited by trawl exclusion zones that are designed to protect stellar sea lions. And, in fact, the 2014 rules added an additional new trawl exclusion zone. These closures are in addition to the existing no trawl zones of 100,000 square kilometers created by the Aleutian Islands Habitat Conservation Area. The main change in the 2014 BIOP in the western Aleutians is that it reopens Area 543 outside of critical habitat to fishing. This allows six vessels, which participate in a cooperative and mostly fish only one to three vessels at a time, to continue where they have historically fished in an area that is 124,000 square miles. This change was made as a result of new telemetry data, which was much more robust than what the agency had before it in 2010. In 2010, the agency had data from three animals. In 2014, they had data from 45 animals. This data showed that overwhelmingly females, who are the population that the agency has identified as being of most concern, were foraging inside critical habitat, not outside critical habitat, 80% of the time in winter, 90% of the time in summer. NIMS's 2014 finding that areas outside of critical habitat are less important to stellar sea lions foraging is consistent with its prior findings in 2000, 2001, and 2003. But this is not the only information relied upon NIMS to make its decisions about the management of the Atka mackerel fishery. I simply disagree with the plaintiff's contention that the overlap analysis was the key linchpin of this decision. NIMS also had new studies and information about Atka mackerel distribution and movement, the effectiveness of the trawl exclusion zones, and in fact in the one area where they found that the trawl exclusion zones were not being effective, they made a bigger one. They also had information about the historical and spatial distribution of fishing effort in time and space, which allowed them to take a much finer look at what they could and couldn't allow. This information was more than adequately, I would say painfully, explained in the EIS and in the Biop. And turning to Pollock, I think the key thing about Pollock is that it actually proves that the overlap analysis did what plaintiffs claim it didn't do. It actually found the potential for localized depletion as a result of the Pollock fishery. But for many reasons, which I'll get to, the agency decided that it could allow the fishing to continue anyway. It is true that commercial fishing for Pollock and the Aleutians was closed in 1999. But in 2005, Congress, not NIMS, reopened the fishery by allocating a very small amount of Pollock solely to the Aleut Corporation. The Aleut Corporation in 2005 tried to fish for that allocation outside of critical habitat and was unable to find commercially viable amounts of Pollock. The 2014 rule opens 35% of critical habitat to Pollock fishing, but the reopened fishery is subject to many, many layers of harvest constraints that were not in place in 1999. The 2014 Biop analyzed the new information about depth partitioning, referred to by Oceana, and concluded reasonably, based on the amount of data before it, and for the first time, data analysis of the depths at which the fishery operates, that stellar sea lions are looking for fish in shallower depths than the fishermen are fishing. This data, not on its own, but in combination with the small amount of the allocation and the tendency of Pollock to have very high horizontal movement, led them to conclude that if localized depletion did occur, it would be very fleeting, no more than a week, and it would not be likely to have population level effects. This was a reasonable decision, and it was explained. Finally, I'd just like to note that I've been involved in stellar sea lion litigation since the late 1990s, and I remember that about the second or third time that we were in front of Judge Zille in the Western District of Washington, he stated, I don't want to be a fishery manager, and I'm not going to be one. And I suggest that that is exactly what Oceana is inviting this court to do in this appeal, and you should decline that invitation. Thank you, Counsel. I believe we have some rebuttal time remaining. I'd like to start by addressing Counsel's argument that the biological opinion, that in 2014 the service became less certain about the link between sea lion decline and the fisheries, about this idea that nutritional stress was even happening, based on the critiques of the peer reviewers. That doesn't match what the biological opinion says. The biological opinion concludes that important data gaps hinder our ability to rule out fishing as contributing to the continued decline and lack of recovery of sea lions. And at 3 ER 385 to 387, the service goes in depth addressing the peer reviewers' concerns about nutritional stress and the support in the record for that. And it essentially says we've done a lot of science, but we actually haven't put together the right variables that would even show us that there is nutritional stress linked to the fisheries. We haven't done the right, we haven't put these things together in the right way to even know that was happening, if it is happening. And so that's why the service concludes a lack of statistical significance in previous studies cannot necessarily be useful as credible scientific evidence against the availability hypothesis. That's at 3 ER 387. So the service actually, it doesn't roll back protections based on the fact that it's less certain about this nutritional stress theory. It continues to retain that theory. Counsel, proposing counsel referred to critiques of the 2010 BIOP by, I think, two different folks. What role, if any, do you think that played in the change of opinion that the agency had as implemented in the 2014 BIOP? Well, as I was pointing out, the service endeavored to answer these peer reviewers' criticisms. And in many cases, they found that they disagreed with the peer reviewers, and that's where I point you to at 3 ER 385 to 387. They go in-depth into why that criticism about the link between nutritional stress and sea lion decline doesn't work here, and why they're continuing to assume that the fisheries will do, contribute to sea lion decline. It's in the next part of the analysis, the overlap analysis, where the service does something different than what it's done before. Briefly on the NEPA point, the internal expert criticism here came from the experts in stellar sea lion science. The folks at the National Marine Mammal Laboratory are the people who have been doing the research on sea lions, and they're the ones who said the overlap analysis is different, and your no jeopardy conclusion hinges on this overlap analysis. We also have that critique from the stellar sea lion coordinator, the person who's tasked with coordinating stellar sea lion science among the agencies. And it's significant criticism from the experts. Finally, I'd like to just touch briefly on the service's duty to protect sea lions' chances of recovery. The service had an affirmative duty to protect sea lions' chances of recovery. Recovery is built into the definition of jeopardize. But logically, if they found there was no jeopardy, then there's nothing to defer to. In other words, ultimately they found that the species is not jeopardized. Right, and we disagree with that. The service didn't take recovery into account in concluding that the species wasn't jeopardized. Well, there's nothing to recover from if there's no depletion. It's just logically they don't fit together. If there's a finding, and I know you disagree with it, but if there's a finding that the species is doing just fine, then recovery just passes out of the picture because there's nothing to recover from. So in context, it seems to me to be right about something else in order for that to even come into play. The service hasn't made a finding that the species is just fine. Stellar sea lions in the western Aleutian Islands are declining at 7% per year. And the service's own recovery plan says if we lose these sea lions in the western Aleutian Islands, sea lions can't recover. We also have the authorized action here, fisheries, is a key factor implicated in sea lion decline. And this court has held that even before a species becomes extinguished, before a population becomes extinguished, it might reach the point at which it's no longer recoverable. Here the service needed to know whether sea lions in the western Aleutian Islands were getting close to that tipping point from which the population can't recover so that it can manage appropriately. If sea lions are getting close to that tipping point, it's going to have to act in a more precautionary manner than if that tipping point is still a long way off. The service didn't do that here. Thank you, Counsel. Thank you. The case just argued is submitted, and we appreciate very much the arguments from all counsel. They've been very helpful.
judges: Graber, Clifton, M. Smith